```
              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MARYLAND


JEFFREY B. POWERS et al.      *
                              *
v.                            *
                              *   Civil Action No. WMN-09-2167
U.S. HOME CORP. d/b/a         *
LENNAR CORPORATION et al.     *
                              *
    *   *   *   *   *   *   *   *   *   *   *   *   *   *   *
```

**MEMORANDUM**

Before the Court is Defendants' Motion to Dismiss.  Paper No. 8.  The motion is fully briefed.  Upon a review of the pleadings and the applicable case law, the Court determines that no hearing is necessary, Local Rule 105.6, and that the motion should be granted.

**I. FACTUAL BACKGROUND**

This diversity action arises out of the sale of several parcels of real estate that, according to the Complaint, were intended for residential development.  As more fully explained below, Plaintiffs entered into purchase agreements for the parcels with Defendant U.S. Home Corporation (US Home).[1]  Included in the purchase agreements are provisions that would

---

[1] In the Complaint, Plaintiffs identify the entity with which they entered the purchase agreements as "U.S. Home Corporation d/b/a Lennar Corporation" and they refer to this entity throughout the Complaint at "Lennar."  Defendants explain that the Lennar Corporation is a separate corporate parent of US Home and is not a proper party to this suit.  Mot. at 8 n.4. Plaintiffs do not challenge that representation.

result in the establishment of "private utility companies," through which Plaintiffs would receive a stream of payments from the ultimate purchasers of the residential lots once the parcels are developed.  Defendant US Home assigned the contracts to a "land-banker,"[2] Defendant SCC Canyon II, LLC (SCC), but in so doing, agreed that the obligations related to the private utility companies would remain those of US Home.  The issues raised in this lawsuit and in the pending motion are whether US Home was permitted to make that partial assignment, whether US Home and/or SCC are presently in breach of the private utility obligations, and whether those obligations are obligations that "run with the land."  In addition to those concerns, Defendants raise the preliminary question as to whether Plaintiffs' claims are sufficiently mature to be justiciable.  The pertinent facts follow.

    Plaintiffs Jeffery and Mark Powers own or owned interests in various entities, including Plaintiffs Powers Homes Management Corp. (PHMC) and M & J Capital, LLP (M&J).  These four Plaintiffs (Jeffrey Powers, Mark Powers, PHMC, and M&J), in some combination, held title to various parcels of land in

---

[2] The Parties agree that "'land-banking' is a common practice in the real estate development industry that allows a builder to finance and acquire an option for a future interest in developable property without having to actually purchase the property or hold title."  Mot. at 11 n. 8; Opp'n at 4-5 (quoting this language with apparent agreement).

Baltimore and Carroll Counties.  On July 22, 2005, Plaintiffs entered into four purchase agreements to sell a total of nine parcels of land to US Home.  The terms of the four agreements were substantially the same.  Only two of the purchase agreements and only two of the parcels referenced in those agreements are relevant to this action: the "Creekside Agreement," Defs.' Ex. 1-A., as it relates to the sale of the "Creekside Parcel;" and the "Cherry Hill Agreement," Defs.' Ex. 1-E, which only related to the sale of a single parcel, the "Cherry Hill Parcel."[3]

The Creekside Parcel encompassed 21.67 acres in Carroll County, Md., developable according to the Complaint into approximately 65 lots for single-family detached homes, and was owned by Taneytown Ventures, L.L.C., which in turn was owned by Powers Homes at Creekside, Inc., which in turn was owned by Mark and Jeffery Powers.  The Creekside Agreement provided in pertinent part that the Powers would transfer their ownership interest in Powers Homes at Creekside to US Home.  The Cherry

---

[3] For reasons not apparent, Plaintiffs attach to their Complaint a Purchase Agreement related to parcels of land not as issue in this action.  See Compl. Ex. A (the "M&J Agreement" relating to the "Delta Property," the "Dillsburg Property," the "Eldersburg Property," and the "Cordorus Property").  Plaintiffs agree, however, that because Plaintiffs reference and rely upon the Cherry Hill and Creekside Purchase Agreements in the Complaint, the Court can consider those documents in the context of a motion to dismiss.  Opp'n at 1 n.1 (citing Fare Deals Ltd. v. World Choice Travel.com, Inc., 180 F. Supp. 2d 678, 683 (D. Md. 2001)).

3

Hill Parcel encompassed 11.3 acres in Baltimore County, Md., developable according to the Complaint into approximately 62 lots for single-family attached homes, and was owned by Powers Homes of Cherry Hill, LLC, which in turn was owned by Mark and Jeffery Powers and PHMC.  The Cherry Hill Agreement provided that the Powers and PHMC would transfer all of their ownership interests in Powers Homes of Cherry Hill, LLC to US Home.

Section 35 of both the Creekside and Cherry Hill Agreements related to the creation of the private utility companies. Section 35 provided in pertinent part:

> [(1)] Purchaser shall create, using forms prepared by the Seller, a single-purpose limited liability company to serve as a private utility company providing water and sewer service to the Property (hereinafter, the "Utility Company").[4]
>
> [(2)] Purchaser agrees that <u>prior to the conveyance of any residential building lot</u> within each respective Property, Purchaser shall record among the land records of the jurisdiction where such Property is located, a Declaration of Covenants, in form prepared by Seller, which shall subject each of the residential building lots established within the Property to an agreement for water and sewer assessments to be paid to such Utility Company in an amount not to exceed One

---

[4] It is undisputed that these Section 35 "Utility Companies" are not entities that would actually own or operate a utility or would provide any services to the eventual homeowners.  They are intended simply to be vehicles for the Sellers to collect future revenue from those who ultimately purchase the homes built on these parcels.  <u>See</u> Defs.' Ex. 1-F, Articles of Organization for Creekside Water and Sewer Utility Company, LLC, prepared by Seller (describing purpose of the entity as "to arrange for the establishment of water and sewer charges against lots located in the development known as Creekside.")

>   Thousand Dollars ($1000.00) per annum for a period not
>   to exceed thirty-three (33) years, which assessments
>   for a particular lot shall commence upon the transfer
>   of title to such lot by Purchaser or its successors to
>   a homeowner (as opposed to a transfer of title to a
>   home builder).
>
>   [(3)] Purchaser shall also construct the water and
>   sewer service serving such Property, in accordance
>   with the Engineering therefore, and
>
>   [(4)] upon completion of the construction of such
>   utilities, but <u>prior to the conveyance of any
>   residential building lot to a homeowner</u>, Purchaser
>   shall assign, without cost or charge, all of the
>   membership interests in the Utility Company to the
>   Seller or its designee.  Following such assignment,
>   Seller or its designee shall have the right to retain
>   all assessments received by the Utility Company.

Defs.' Ex. 1-E at 22 (emphasis added).[5]

The Purchase Agreement also contained provisions related to the assignment of those agreements.  Section 17 of the Purchase Agreements provided in pertinent part:

>   Purchaser shall have the right to assign this
>   agreement without the Seller's written approval to any
>   affiliate of Purchaser . . . or to a third-party
>   institutional "land-bank" lender who will acquire the
>   Ownership Interests of one or more of the Principals
>   or Title Owners hereunder in conjunction with the
>   execution of an option agreement to sell finished lots
>   from the affected Property to Purchaser or its
>   affiliates (which assignment shall occur concurrently
>   with each applicable Closing). . . .  Upon any such
>   assignment, the assignee shall become the Purchaser
>   for all purposes of this Agreement.  Purchaser shall
>   also have the right to assign all or portions of this
>   Agreement to individuals or entities other than those

---

[5] Because the Creekside Agreement involved several parcels of land, where the Cherry Hill Agreement references "Property," the Creekside Agreement references "each respective Property."  See Defs.' Ex. 1-A.  The provisions are otherwise identical.

>   described above; provided that, notwithstanding any
>   such assignment, US Home shall remain liable for the
>   performance of all of the obligations of the Purchaser
>   hereunder. . . .

Defs.' Ex. 1-A at 16.

On January 27, 2006, US Home and SCC executed a written agreement entitled "Partial Assignment and Assumption of Membership Sale Agreement," which related to the Creekside Parcel.  Defs.' Ex. B.[6]  In that agreement, US Home assigned to SCC its right, title, and interest with respect to Powers Homes at Creekside, Inc, and the Creekside Parcel.  The assignment, however, specifically excluded the Section 35 obligations, providing that "[US Home] shall remain liable for all obligations under Paragraph 35 of the Membership Sale Agreement (and [SCC] shall have no obligation of liability thereunder.  Id. at § 1(b)(iv).  While they provide no further details, Plaintiffs also allege that US Home has made a similar partial assignment to SCC of the Cherry Hill Agreement and the Cherry Hill Parcel.

Plaintiffs acknowledge that SCC has fulfilled at least some of the Section 35 obligations in that it has completed construction of the utilities on the Creekside and Cherry Hill Parcels.  Compl. ¶ 40.  Plaintiffs complain, however, that SCC has not fulfilled the other Section 35 obligations, i.e., (1)

---

[6] Because the Complaint references this document, the Court can consider it in ruling on the motion to dismiss.  See n.1.

6

creating the private utility companies, (2) recording in the land records for each building lot the "Declarations of Covenants" regarding the obligation to pay utility fees, and (3) assigning the membership interests in the private utility companies to the Plaintiffs.  Based upon the assumption that houses will be built and sold on every proposed lot on the Creekside and Cherry Hill Parcels, and that the maximum permissible assessment of $1,000.00 would be collected for the maximum permissible duration of 33 years, Plaintiffs claim a loss of revenue of $4,191,000.00 for these alleged breaches. Compl. ¶ 44.  Of note, however, Plaintiffs do not allege that a single home has yet to be sold, or even that construction has begun on any house on either parcel.

In moving to dismiss the Complaint under Rule 12(b)(1) of the Federal Rules of Civil Procedure, Defendants argue that Plaintiffs' claims are "premature, speculative, uncertain, not ripe, and contingent upon events that have not yet occurred and may never occur."  Mot. at 3.  The Court must agree.

Under Article III, Section 2 of the Constitution, the jurisdiction of the federal courts extends only to actual "cases or controversies."  Plaintiffs bear the burden of alleging: (1) a concrete and actual or imminent "injury in fact;" (2) causation between the plaintiff's injury and the defendant's conduct; and (3) a likelihood that the requested relief will

creating the private utility companies, (2) recording in the land records for each building lot the "Declarations of Covenants" regarding the obligation to pay utility fees, and (3) assigning the membership interests in the private utility companies to the Plaintiffs.  Based upon the assumption that houses will be built and sold on every proposed lot on the Creekside and Cherry Hill Parcels, and that the maximum permissible assessment of $1,000.00 would be collected for the maximum permissible duration of 33 years, Plaintiffs claim a loss of revenue of $4,191,000.00 for these alleged breaches. Compl. ¶ 44.  Of note, however, Plaintiffs do not allege that a single home has yet to be sold, or even that construction has begun on any house on either parcel.

In moving to dismiss the Complaint under Rule 12(b)(1) of the Federal Rules of Civil Procedure, Defendants argue that Plaintiffs' claims are "premature, speculative, uncertain, not ripe, and contingent upon events that have not yet occurred and may never occur."  Mot. at 3.  The Court must agree.

Under Article III, Section 2 of the Constitution, the jurisdiction of the federal courts extends only to actual "cases or controversies."  Plaintiffs bear the burden of alleging: (1) a concrete and actual or imminent "injury in fact;" (2) causation between the plaintiff's injury and the defendant's conduct; and (3) a likelihood that the requested relief will

redress the alleged injury.  See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992).  As to that first prong, an "injury in fact" is characterized as "an invasion of a legally protected interest which is concrete and particularized, and actual or imminent, not conjectural or hypothetical."  Id.  A plaintiff alleging a future injury at some indefinite time does not support a finding of an "actual or imminent injury."  Lujan, 504 U.S. at 564.

Here, it is clear that Plaintiffs have yet to suffer any actual harm.  In fact, there has yet to be a breach of the Section 35 provisions.  The Purchase Agreements specified that the covenants had to be recorded in the land records, "prior to the conveyance of any residential building lot within each respective Property" and that the assignment of membership interests had to occur "prior to the conveyance of any residential building lot to a homeowner."  As no building lot has yet to be conveyed, there has been no breach and there could be no actual damages related to the Section 35 provisions.

Nor can Plaintiffs' damages be said to be imminent.  As Defendants note, before Plaintiffs suffer actual damages, three events must occur: (1) SCC must sell its interests in the Parcels to either US Home or some other homebuilder;[7] (2) US Home

---

[7] It is undisputed that SCC, as a land banker, is not in the business of building homes.

or that other homebuilder must build homes on the lots; and (3) the finished homes must be conveyed to the homeowner without the utility covenant first being recorded and membership interest in the private utility company assigned.  Allegations contained in the Complaint itself undermine the certainty of at least some of these events occurring.  According to the Complaint, at least one of the parcels sold to SCC, the Codorus Parcel, was repurchased by Plaintiffs and, according to Plaintiffs, the Section 35 obligations were "nullified."  Compl. ¶ 42(a).  Another parcel, the Whitehurst Parcel, was assigned by US Home to SCC, transferred by SCC to a third party developer, and, as acknowledged by Plaintiffs in the exhibit submitted with their opposition, that third party developer proceeded to perform all of the Section 35 obligations.  Pls.' Ex. 1.

Furthermore, while the parties, no doubt, fully intended that the parcels be developed into residential developments, the Court is aware that events can occur that frustrate those intentions.  By way of example, from the allegations in a parallel lawsuit arising out of one of the other Purchase Agreements between Plaintiffs and US Home, U.S. Home Corp. v. Mark Powers, Civ. No. WMN-09-2807 (D. Md.), it appears that the presence of significant amounts of lead and arsenic on one of the parcels sold by Plaintiffs to US Home will prevent or at least seriously delay any residential development on that

9

parcel.  There are obviously countless other contingencies that could prevent, or significantly delay, the construction of houses on a particular parcel, not the least of which could be changing economic conditions.

In addition, it is simply not apparent from the allegations in the Complaint that, if the land is sold to US Home or another homebuilder, and if homes are built, that Defendants will breach the Section 35 provisions by failing to record the covenants or assign to membership interests.  To support their argument that Defendants have already committed an "anticipatory breach" of the agreements, Plaintiffs allege that Defendants "have indicated that they do not intend to fulfill the Private Utility Obligation with respect to any of the parcels to which those obligations apply."  Compl. ¶ 39.  An "indication" concerning an "intention" does not constitute the kind of "positive and unconditional" refusal to perform a contract that Maryland law requires before an anticipatory breach or repudiation of a contract is found.  See Weiss v. Sheet Metal Fabricators, Inc., 110 A.2d 671, 675 (Md. 1955).  Any certainty that Defendants will breach their obligations is also undermined by Plaintiffs' acknowledgement, referenced above, that the Section 35 obligations were met as to at least one of the parcels sold by SCC to a developer.

As this Court has previously observed, to have standing to bring suit, "[p]laintiffs must allege that they have been harmed in fact, not that they 'can imagine circumstances in which [they] could be affected.'" Doe v. Blue Cross Blue Shield of Md., Inc., 173 F. Supp. 2d 398, 403 (D. Md. 2001) (quoting United States v. Students Challenging Regulatory Agency Procedures, 412 U.S. 669, 688 (1973)). More recently, in Robinson v. Board of County Commissioners, Civ. No. 07-1903, 2008 WL 2484936 (D. Md. June 19, 2008), this Court dismissed for lack of standing a claim that was contingent on events that were reasonably anticipated but not guaranteed to occur. In Robinson, a developer expressed its intention to donate a parcel of land to a non-profit organization for the construction of housing for low- and moderate-income families. After county officials denied the requested upgrade of water and sewer services that would have made the development possible, the builder that would have constructed the low- and moderate-income housing filed suit. This Court observed that, for the builder to demonstrate an actual or imminent injury, two events must first occur: (1) the developer must go forward with the proffered donation to the non-profit organization and (2) the non-profit must enter into an arrangement with the builder to develop the housing on the donated lot. Because neither of these events were "guaranteed to occur," the Court held that the

builder could not show that it had suffered any loss to a legally protected interest.  Id. at *6;[8] see also Hanak v. Taylor, 25 F.3d 1039 (Table), 1994 WL 202385 (4th Cir. May 24, 1994) (affirming dismissal for lack of standing of claims that were premised on the occurrence of a series of uncertain events).

In addition to their anticipatory breach theory, Plaintiffs rely on their request for declaratory judgment to establish that there is a present case or controversy.  Relying heavily on a decision of a bankrupty court in the Northern District of Illinois, In re HA 2003, Inc., 310 B.R. 710 (Bankr. N.D. Ill. 2004), Plaintiffs opine that "[t]he primary purpose of the Declaratory Judgment Act is to avoid accrual of avoidable damages to one not certain of his rights and to afford him an early adjudication without waiting until his adversary should see fit to begin suit, after damages had accrued.  Therefore, [a]ctions for declaratory relief are routinely upheld where one party to an agreement seeks a determination of the respective rights and liabilities under the contract terms.  In those cases, declaratory relief is appropriate without requiring the

---

[8] Plaintiffs attempt to distinguish Robinson in a footnote, arguing that, in Robinson, there was no contract to donate the land to the non-profit.  Opp'n at 9 n.5.  It is equally true, however, that in the case at bar there is nothing that contractually binds US Home or SCC to actually build any houses on the lots in question.

parties to commit a breach or sustain damages." Opp'n 19-20 (internal quotations and citations omitted, emphasis added by Plaintiffs).

Unlike the plaintiffs in the cases upon which they rely, Plaintiffs here, of course, are not bringing an action in order to avoid the accrual of potential damages. Instead, they are seeking a declaration that Defendants would be in breach if and when a number of uncertain events were to occur. Furthermore, the case upon which they chiefly rely emphasizes that the Declaratory Judgment Act "does not dispense with the Constitution's requirement that federal courts hear only actual cases or controversies." In re HA 2003, 310 B.R. at 720-21. For the court to have jurisdiction, the parties must "have a real dispute shown by events having already occurred." Id. at 721 (emphasis added).

The facts and specific holdings in In re HA 2003, further highlight the non-justiciable nature of Plaintiffs' claims. In In re HA 2003, a corporation brought a declaratory judgment action against an insurance company that provided Directors' and Officers' insurance. The corporation had previously filed a suit against its former CEO and director and the insurance company took the position that it did not have to indemnify the CEO in the event of a judgment against him in that suit, relying upon an "insured versus insured exclusion." In the declaratory

13

judgment action, the corporation sought, inter alia, two determinations: (1) a declaration that the former CEO had a right to enter into a settlement with the corporation even though the insurance company would not approve it; and (2) that the proposed settlement that it negotiated with the former CEO was reasonable.

As to the first declaration, the court held,

> [t]his is an actual controversy because [the former CEO] is presently threatened by the possibility that his proposed settlement with [the corporation] without [the insurer's] approval will cause him to lose coverage under the policies.[9]  <u>The issue can be decided based on events that have already occurred, not based on hypothetical facts or speculative contingencies</u>. Thus, this determination falls squarely within the purpose of the Declaratory Judgment Act, <u>which is to prevent avoidable damages to a party not certain of his rights</u>.

<u>Id.</u> at 721 (emphasis added).  In contrast, the court dismissed the count seeking the declaration concerning the reasonableness of the proposed settlement, concluding that "[t]his count seeks a declaration based on events that have not yet occurred-namely the signing of a settlement agreement between [the corporation] and [the former CEO]: . . . [it] does not address an actual case or controversy, but rather seeks a hypothetical advisory opinion."  <u>Id.</u> at 722.  Likewise, in the case at bar, Plaintiffs

---

[9] The policy contained a consent clause under which the insured could lose his coverage were he to enter a settlement without prior approval of the insurer.

14

seek a declaration based on events that might or might not ever occur.

Finally, to establish that there is a present case or controversy, Plaintiffs point to their allegation that US Homes breached the Purchase Agreement when it made the partial assignment to SCC.  Assuming this was a breach, Plaintiffs have not explained how that breach caused more than a conjectural or hypothetical injury.  Unless and until that partial assignment were to result in the sale of a house without the prior recording of the utility covenant or assignment of membership interests, Plaintiffs have suffered no actual injury.  See Amburgy v. Express Scripts, Inc., Civ. No. 09-705, 2009 WL 4067218 (E.D. Mo. Nov. 23, 2009) ("Abstract injury is not enough to demonstrate injury-in-fact. Plaintiff must allege that he has sustained or is in immediate danger of sustaining some direct injury as a result of the challenged conduct.").

Because the Court finds that the Complaint does not present a live case or controversy, it will be dismissed.  A separate order will issue.

```
                          _____/s/_____
                          William M. Nickerson
                          Senior United States District Judge
```

DATED:   February 18, 2010